<u>NOT FOR PUBLICATION</u>

**FILED**
JAMES J. WALDRON, CLERK
**AUG. 15, 2016**
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: s/ *Ronnie Plasner*
JUDICIAL ASSISTANT

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>**JAMES H. GIANNINOTO,**<br><br>                    Debtor. | Case No.:     14-35883 (JKS)<br><br>Judge:         Hon. John K. Sherwood<br><br>Chapter:      7 |
| **JOHN W. SYWILOK,**<br><br>                    Plaintiff,<br>**v.**<br><br>**INTERNAL REVENUE SERVICE, STATE OF NEW JERSEY, JP MORGAN CHASE, NA, and WENDY P. GIANNINOTO,**<br><br>                    Defendants. | Adv. Pro. No. 15-01195 (JKS) |

<u>**TRIAL DECISION**</u>

**APPEARANCES:**

Gardy & Notis, LLP
James H. Gianninoto, Esq.
560 Sylvan Avenue, Suite 3085
Englewood Cliffs, New Jersey 07632
*Counsel for Defendant,*
*Wendy P. Gianninoto*

Buckley Madole, P.C.
Richard P. Haber, Esq.
99 Wood Avenue South, Suite 803
Iselin, New Jersey 08830
*Co-Counsel for Defendant,*
*JPMorgan Chase Bank, N.A.*

Fidelity National Law Group
David A. Niles, Esq.
105 Eisenhower Parkway, Suite 103
Roseland, New Jersey 07068
*Co-Counsel for Defendant,*
*JPMorgan Chase Bank, N.A.*

**A.    Introduction**

1. On August 3 and 4, 2016, the Court conducted a trial addressing the remaining claims and defenses of Wendy P. Gianninoto ("Mrs. Gianninoto") and JP Morgan Chase, NA ("Chase") concerning their competing interests in residential property located at 19 Glenwood Road, Upper Saddle River, New Jersey (the "Property").

2. This adversary proceeding arises out of the Chapter 7 bankruptcy case of James H. Gianninoto (the "Debtor"). He owns the Property with his wife, Mrs. Gianninoto. The Debtor is a practicing attorney in New Jersey and represented his wife in the adversary proceeding as she sought to protect her home from her husband's creditors.

3. Chase seeks a declaration that its mortgage, which was by signed by Mrs. Gianninoto, may be enforced against her interest in the Property. By prior orders in this adversary proceeding, the Court has held that the Debtor's interest in the Property: (i) is not encumbered by the Chase mortgage and (ii) could be sold along with Mrs. Gianninoto's interest in the Property by John W. Sywilok, chapter 7 trustee for the Debtor's estate (the "Trustee"), pursuant to section 363(h) of the Bankruptcy Code. Thus, this case has boiled down to the competing claims of Mrs. Gianninoto and Chase for the proceeds of the sale of Mrs. Gianninoto's interest in the Property.

4. Mrs. Gianninoto defends against Chase's claim to the sale proceeds by asserting that the mortgage is void and unenforceable because it was induced by fraud. She also argued that Chase had not demonstrated that it was the holder of the mortgage. The Court concludes that Mrs. Gianninoto has not prevailed on either of these defenses as set forth below.

5. The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

**B.    Jurisdiction**

6. This matter is a core proceeding under 28 U.S.C. §§ 157(N) and (O) because it resolves a dispute regarding distribution of proceeds from the sale of property of the Debtor's estate pursuant to 11 U.S.C. § 363(h).

7. By Order dated June 28, 2016, the Court granted partial summary judgment in this adversary proceeding to the Trustee under section 363(h) of the Bankruptcy Code. Thus, the Trustee has been authorized to sell the Property and retain the Debtor's share of the sale proceeds for the benefit of the bankruptcy estate. Resolution of the issues between Mrs. Gianninoto and Chase is necessary to determine who is entitled to Mrs. Gianninoto's share of the sale proceeds.

8. Also, no party has challenged the Court's jurisdiction over this proceeding despite being invited to do so. (*See* Opinion at 22, ECF No. 55).

**C.    Case Overview**

9. On December 5, 2007, the Debtor refinanced the mortgage on his home by obtaining an $890,000 mortgage loan from Washington Mutual Bank, NA ("WaMu"). While only the Debtor is liable on the WaMu note, both the Debtor and Mrs. Gianninoto executed the mortgage. (JPMC Exs. 2 and 3).

10. WaMu never recorded the mortgage.

11. On September 25, 2008, WaMu failed as an institution and the Office of Thrift Supervision appointed the FDIC as receiver.

12. On the same date, the FDIC sold all of WaMu's assets to Chase pursuant to a "Purchase and Assumption Agreement." (JPMC Ex. 1).

13. In June 2014, Chase sent a letter to the Debtor advising that the mortgage was not recorded and requesting the execution of a replacement mortgage. After it became clear that the Debtor was not willing to voluntarily assist Chase in recording the mortgage, Chase filed a lawsuit on December 22, 2014 in the Superior Court of New Jersey, Chancery Division, Bergen County, captioned *JP Morgan Chase Bank, National Association v. James H. Gianninoto, et al.*, Docket No. BER-C-360-14, seeking to quiet title and reform the mortgage. (*See* Opinion at 4-6, ECF No. 55).

14. On December 24, 2014, the state court entered an Order to Show Cause requiring the Debtor and his wife to show why Chase should not be permitted to record a copy of the mortgage as an original. (*Id.*).

15. The Debtor filed a chapter 7 petition on December 29, 2014 and the Trustee was appointed the following day.

16. On February 17, 2015, the Trustee filed this adversary proceeding against the IRS, the State of New Jersey, Chase, and Mrs. Gianninoto, seeking to avoid Chase's unrecorded mortgage against the Debtor's interest in the Property pursuant to 11 U.S.C. § 544 and sell the Debtor's interest in the Property pursuant to 11 U.S.C. § 363(h).

17. The Trustee filed a motion for summary judgment regarding the enforceability of Chase's mortgage against the Debtor's interest in the Property. (ECF No. 17).

18. Chase filed a cross-motion for summary judgment on its counterclaims against the Trustee and on Count Four of its cross-claims against Mrs. Gianninoto, which sought a declaration that the mortgage could be enforced against her interest in the Property. (ECF No. 27).

19. Mrs. Gianninoto filed an amended answer and cross-claims against Chase, seeking a declaration that the mortgage was invalid and unenforceable against her interest in the Property. (ECF No. 45).

20. In a written opinion dated October 16, 2015 (the "Opinion"), the Court held that the Trustee was entitled to avoid Chase's unrecorded mortgage and that its secured claim could not be enforced against the bankruptcy estate's interest in the Property. (Opinion, ECF No. 55). The Opinion also granted partial summary judgment in favor of Chase on its claim to enforce the mortgage against Mrs. Gianninoto, rejecting as a matter of law her arguments that:

    i. The mortgage could not be enforced because Mrs. Gianninoto did not understand that she was mortgaging her interest in the Property when she signed it.

    ii. The mortgage could not be enforced because a creditor of only one spouse cannot enforce a security interest against the non-debtor spouse's interest in property held in a tenancy by the entirety.

    (*Id.* at 18-21).

21. The Opinion did not rule on Mrs. Gianninoto's claims that the mortgage could not be enforced because it was induced by fraud and violated the New Jersey Consumer Fraud

Act ("NJCFA"), N.J.S.A. 56:81-1, *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.* Those claims were not before the Court on summary judgment.

**D.    Chase Motion to Dismiss under FIRREA**

22. Shortly thereafter, Chase moved to dismiss Mrs. Gianninoto's amended cross-claims and moved for summary judgment on its claims to enforce the mortgage against her interest in the Property. (ECF Nos. 59 and 66).

23. Mrs. Gianninoto filed a cross-motion to file a second amended responsive pleading, which the Court granted. (ECF 69).

24. In addressing these motions, the Court held that many of Mrs. Gianninoto's claims against Chase were precluded by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1821(d)(13)(D). FIRREA establishes an administrative procedure for resolving claims against a failed institution and generally bars claims against the purchaser of the failed institution's assets. *Farnik v. F.D.I.C.*, 707 F.3d 717, 722 (7th Cir. 2013) ("Courts lack authority to review FIRREA claims 'relating to any act or omission' of a failed bank or of the FDIC as receiver of a failed bank unless they are first subjected to FIRREA's administrative claims process.").

25. Because FIRREA does not bar defenses to actions brought by the purchaser of the failed institution's assets, the Court recognized that Mrs. Gianninoto's claims that were actually defenses to enforcement of the mortgage were preserved. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. City Sav. F.S.B..* 28 F.3d 376, 393 (3d Cir. 1994) ("[T]he plain meaning of the language contained in § 1831(d)(13)(D) indicates that the statute does not create a jurisdictional bar to defenses or affirmative defenses which a party seeks to raise in defending against a claim.").

26. The Court also recognized that Mrs. Gianninoto's claims based on solely on Chase's conduct were possibly viable. *See In re Settlers' Hous. Serv., Inc*., 540 B.R. 624, 636 (Bankr. N.D. Ill. 2015) ("Claims against the successor in interest for its own alleged wrongdoing, instead of the action of the predecessor in interest for which the FDIC was receiver . . . are not claims that would be jurisdictionally barred by § 1821(d)(13)(D)."). At trial, Mrs. Gianninoto did not present any claims or defenses that were based on Chase's conduct.

**E.    Mrs. Gianninoto's "Standing" Defense**

27. One of Mrs. Gianninoto's defenses to Chase's enforcement of its mortgage is that the December 5, 2006 WaMu note and mortgage were not among the assets acquired by Chase from WaMu. Thus, Chase did not have standing to enforce the mortgage against Mrs. Gianninoto. This defense was not established at the trial.

28. First of all, the Gianninotos themselves made payments on the loan to Chase after it was transferred from WaMu. They never made payments to any entity other than Chase. And, no entity other than WaMu or Chase has ever requested payment upon the loan.

29. Article 3.1 of the Purchase and Assumption Agreement provides that: "Assuming Bank [Chase] hereby purchases from the Receiver [FDIC], and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) . . . of the Failed Bank [WaMu]." (JPMC Ex. 1).

30. The same provision further provides that "Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank." (*Id.*).

31. These provisions indicate that the Purchase and Assumption Agreement contemplated the transfer of all of WaMu's assets, including the loan in question, to Chase.

32. The testimony of Albert Smith, a mortgage banking research officer for Chase, corroborated the transfer of the Gianninoto loan from WaMu to Chase.

33. Mr. Smith reviewed Chase's computerized loan records and determined that Chase acquired the loan and its servicing rights from WaMu. Smith testified that he knew that the loan was not securitized (sold in the financial markets) because it is coded as a "bank owned loan," as opposed to a securitized loan, in Chase's records. Mrs. Gianninoto produced no evidence to the contrary.

34. Last, but not least, Chase produced the original note at trial, which was endorsed in blank by WaMu. (JPMC Ex. 2).

35. Chase firmly established that it was the holder of the note and mortgage and could enforce them subject to any defenses that survived the FIRREA jurisdictional bar referred to above. *See Wells Fargo Bank, N.A. v. Ford,* 418 N.J. Super. 592, 597-98 (2011).

**F.   Mrs. Gianninoto's Fraudulent Inducement Defense/Cross-Claim against Chase**

36. The argument and testimony at trial suggested that Mrs. Gianninoto was asserting theories of both fraudulent misrepresentation and fraud by omission to support her fraudulent inducement defense against enforcement of the mortgage.

37. A claim for fraud must include specific details concerning the alleged fraud including the "who, what, when, where, and how" of the misrepresentation. *In re Dulgerian,* 388 B.R. 142, 147 (Bankr. E.D. Pa. 2008) (citing *In re Rockefeller Center Properties Inc. Securities Litigation*, 311 F.3d 198, 218 (3d Cir. 2002)).

38. A party alleging fraud has the burden of proving its claim by "clear and convincing" proof. *McConkey v. AON Corp.*, 354 N.J. Super. 25, 45-46 (App. Div. 2002) (citing *Fox v. Mercedes-Benz Credit Corp.*, 281 N.J. Super. 476, 484 (App. Div. 1995)).

    **(1).    Fraudulent Misrepresentation**

39. The essence of Mrs. Gianninoto's fraudulent misrepresentation claim is that she communicated her intent to apply for a "traditional" or "conventional" 30-year mortgage over phone conversations with representatives of <u>either</u> WaMu or Sage Credit Company, the mortgage broker retained by her husband. (See JPMC Ex. 15). But WaMu, without her knowledge or consent, gave the Debtor an adjustable rate mortgage note with multiple payment options, including a minimum payment option that was certain to result in "negative amortization." (*See* JPMC Ex. 2 § 3). Mrs. Gianninoto testified that she was not familiar with the concept of negative amortization at the time she signed the mortgage and was shocked to learn some four years after the loan closing that the principal amount of the loan had increased substantially. She did not understand that when the minimum payment option was selected month after month, the difference between the minimum payment amount and the actual interest rate would be added to the principal amount of the loan. Mrs. Gianninoto argued that she deserved to have the specifics of this unconventional loan product explained to her before she agreed to pledge her interest in the Property as collateral. She testified that had she known about the negative amortization feature of the mortgage loan, she would not have signed the mortgage.

40. For the most part, Mrs. Gianninoto was a sympathetic and credible witness. She candidly admitted that she could not recall specifics concerning which documents she saw and

reviewed at the loan closing in December 2007 or who she spoke to during the weeks prior to the closing. While the Court is inclined to accept Mrs. Gianninoto's testimony that she did not understand the negative amortization features of the loan until years after the closing, she did not prove by clear and convincing evidence that her lack of understanding was due to WaMu's fraudulent conduct. Based on the evidence, this lack of understanding may very well have been due to her own failure to review the loan documents before closing or a breakdown of communication with her husband, who certainly was on notice that the loan had a negative amortization option.

41. Mrs. Gianninoto also alleged that the "Fixed/Adjustable Rate Rider" to the mortgage (JPMC Ex. 4) contained misleading statements regarding the effect of choosing the minimum payment option and the possibility of negative amortization. This is an important document in this case because Mrs. Gianninoto signed it at closing. The rider provided in relevant part:

> THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM INTEREST RATE I MUST PAY. *FOR A LIMITED TIME I WILL HAVE A PAYMENT OPTION THAT IS LESS THAN THE FULL AMOUNT OF INTEREST RATE DUE. IF I CHOOSE THIS OPTION, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE GREATER THAN THE AMOUNT I ORIGINALLY BORROWED.*

(JMPC Ex. 4) (emphasis added).

42. Mrs. Gianninoto points out that the use of the word "could" in the last sentence above was misleading because the selection of the minimum payment option under the note was "virtually certain" to result in an increase in the principal amount of the loan. Though the

11

Court agrees with her on this point, it does not by itself mean that she has established a fraudulent inducement defense.

43. Fraud based on an affirmative representation requires proof of five elements:

   i. Material misrepresentation by the defendant of a presently existing fact or past fact;

   ii. Knowledge or belief by the defendant of its falsity;

   iii. An intent that the plaintiff rely on the statement;

   iv. Reasonable reliance by the plaintiff; and

   v. Resulting damages to the plaintiff.

*Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 175 (2006).

44. Mrs. Gianninoto's recollection of her phone conversations with representatives of either WaMu or Sage Credit Company was general at best. She could not identify a specific representation that was made, the name of the person making the representation or whether she was speaking with a representative of WaMu or Sage Credit Company.

45. Mrs. Gianninoto loosely implied that WaMu was liable for representations by Sage Credit Company under an "apparent agency" theory but did not set forth facts that support the existence of an agency relationship. *See Carrier v. Bank of Am., N.A.*, No. CIV. 12-104 RMB/JS, 2014 WL 356219 at *5 (D.N.J. Jan. 31, 2014), *aff'd sub nom. Carrier v. Bank of Am. NA*, 592 F. App'x 135 (3d Cir. 2015). In fact, the only evidence at trial was that Sage Credit Company was a representative of the Debtor, not WaMu. (JPMC Exs. 15 and 16).

46. Mrs. Gianninoto's inability to identify a misrepresentation made by a WaMu representative is fatal to her fraud claim based on what she said or was told in telephone conversations during the loan application process.

47. As to the misleading statement in the rider (JPMC Ex. 4) referred to in paragraph 41 above, if Mrs. Gianninoto was confused by the statement about the potential for the principal balance of the note to increase, she could have consulted the note (JPMC Ex. 2), which clearly lays out the consequences of choosing the minimum payment option. Though Mrs. Gianninoto did not sign the note, she did mortgage her interest in the Property to secure it and there was no evidence that WaMu took any steps to conceal the terms of the note from her.

48. Mrs. Gianninoto also failed to present any specific evidence that she actually relied on this statement in the rider at or prior to closing. Again, her recollection was vague as to what documents she saw and read up to the date of the loan closing.

49. The exhibits reveal that the Debtor may have been responsible for Mrs. Gianninoto not receiving the loan she intended to apply for or not understanding the terms of the loan that was received.

50. Mrs. Gianninoto recalled applying for a "conventional" amortizing mortgage and testified that the type of loan she applied for was consistent with an unsigned loan application indicating an $890,000 loan with a 7.75% interest rate and an "Amortization Type" of "ARM." (WPG Ex. A)

51. However, the Debtor signed at least two loan applications which indicate that the "Amortization Type" of the loan sought was "Other (explain): multipay 5/1 IO."[1] (JPMC Exs. 12 and 13).

52. The Debtor also signed an addendum to the loan application in which he certified that he received copies of the "Consumer Handbook on Adjustable Rate Mortgages" and the "Adjustable Rate Mortgage Loan Disclosure Statement." (JPMC Ex. 21). A letter enclosing these documents was sent to the Debtor on October 19, 2007. (JPMC Ex. 14). The first page of the "Adjustable Rate Mortgage Loan Disclosure Statement" contains detailed disclosures regarding negative amortization and the effect of selecting the minimum monthly payment option. (JPMC Ex. 20). And the Debtor executed the note which clearly spells out that payment of the minimum amount will result in negative amortization.

53. Thus, there is strong evidence that the Debtor intended to apply for the loan that he obtained and that he received many disclosures regarding negative amortization. The Debtor has not claimed that he was defrauded by WaMu or that he was somehow prevented by WaMu from showing these disclosures to his wife. Without such testimony from the Debtor, it is not possible for the Court to conclude that WaMu intended to defraud Mrs. Gianninoto.

54. Finally, Mrs. Gianninoto failed to introduce any evidence of damages incurred as a result of an alleged misrepresentation and the Court is hard pressed to come up with a measure of damages that would be meaningful to her under these circumstances. The "Borrower Statement" from the closing of the WaMu loan transaction shows that WaMu's $890,000 loan was used to pay off the existing mortgage on the Property, which had a balance of

---

[1] "IO" stands for "interest only."

$767,777.71, as well as many of the Debtor's other debts. (JPMC Ex. 39). Even if the Court *sua sponte* decided to write the negative amortization provisions out of the loan terms, Mrs. Gianninoto's interest in the Property would still be subject to a claim for the full principal plus a reasonable amount of interest. The Property is being sold for $679,000, and thus Mrs. Gianninoto's half interest (worth between $330,000 and $385,000)$^2$ would be fully encumbered by even what she understood to be a "traditional" or "conventional" loan for $890,000.$^3$ Since Mrs. Gianninoto is not liable on the note, the extent to which the loan balance exceeds the value of her interest in the Property is irrelevant to her.

55. Thus, Mrs. Gianninoto failed to prove each element of her fraudulent misrepresentation claim by clear and convincing proof.

### (2).  Fraudulent Omission

56. Mrs. Gianninoto's fraudulent omission claim is that WaMu deliberately failed to provide her with required disclosures regarding the terms of the loan since much of the loan correspondence was addressed solely to the Debtor and only certain documents in the closing package were tabbed for her signature.

57. The elements of a fraudulent omission claim are similar to the elements of fraud by an affirmative representation. *See N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.,* 319 N.J. Super. 435, 446 (App. Div. 1998) ("Deliberate suppression of a material fact that should be disclosed is equivalent to a material misrepresentation (*i.e.*, an affirmative false statement."). Mrs. Gianninoto would have to show that: (1) WaMu violated a duty to

---

$^2$ Although Mrs. Gianninoto disputes that the Property is being sold for its fair value, even under her valuation the Property is worth no more than $765,000.
$^3$ The Chase payoff amount is now more than $1 million. (JPMC Ex. 5).

15

disclose a material fact; (2) WaMu acted knowingly and with intent to deceive; (3) she would have acted differently if she had known about the concealed fact; and (4) she sustained damages as a result of the fraudulent omission.

58. As set forth above, Mrs. Gianninoto has not offered any proof of damages resulting from the alleged fraudulent omission.

59. Also, Mrs. Gianninoto failed to show that any non-disclosure by WaMu was with fraudulent intent.

60. WaMu did make a disclosure directly to Mrs. Gianninoto about negative amortization in the rider. (JPMC Ex. 4). While the language of this document was ambiguous, it did disclose that negative amortization was a possibility. And, as noted, WaMu sent specific disclosures concerning negative amortization to the Debtor. (JPMC Exs. 14, 20, 21). If WaMu intended to defraud Mrs. Gianninoto by withholding information about negative amortization, it is unlikely that it would have sent these disclosures to her home.[4] There is no evidence suggesting that Mrs. Gianninoto was intentionally prevented from reviewing the note and the various disclosures regarding negative amortization that were sent to her home. The fact that most of these disclosures were addressed to the Debtor alone does not prove fraudulent intent on the part of WaMu.

61. Thus, Mrs. Gianninoto has not demonstrated the elements of a fraudulent omission claim by clear and convincing evidence.

---

[4] Mrs. Gianninoto testified that she completed a loan application that was addressed to her husband, which indicates that the Debtor shared some of the documents he received from WaMu with her.

### (3). Violations of the TILA

62. Mrs. Gianninoto also alleged that WaMu violated the TILA by failing to provide her with certain disclosures.

63. Where violations of the TILA occur, borrowers may seek statutory penalties, actual damages, or the right of rescission (which expires at most three years after the transaction is entered into). *See* 15 U.S.C. §§ 1639 and 1640; *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 416 (1998).

64. While affirmative damages claims must be brought within one year of the occurrence of the violation, the TILA permits such claims to be asserted "as a matter of defense by recoupment or set-off" in actions to collect on a debt brought outside of the one-year period. 15 U.S.C. § 1640(e). Thus, Mrs. Gianninoto's claims could arguably survive FIRREA's jurisdictional bar.

65. However, despite amending her pleadings on two occasions, Mrs. Gianninoto never identified (either in her pleadings or at trial) a specific provision of the TILA or implementing Regulation Z, 12 C.F.R. §§ 226.1 *et seq.*, that was violated by WaMu. Mrs. Gianninoto's failure to identify relevant provisions and how WaMu violated these provisions is fatal to her claims.

66. Further, Mrs. Gianninoto presented no evidence of damages and the right of rescission is now time barred. Statutory penalties are capped at $4,000 plus twice the amount of any finance charge in connection with the transaction. *See* 15 U.S.C. § 1640(a)(2). Thus, available remedies for violations of the TILA would not materially affect the amount of Chase's claim.

67. Also, Mrs. Gianninoto received and signed at least two disclosures required by the TILA: the disclosure statement required by 12 C.F.R. §§ 226.17 and 226.18 (JPMC Ex. 25) and

17

the notice of right to rescind required by 12 C.F.R. §§ 226.23 (JPMC Ex. 38). That Mrs. Gianninoto received some disclosures required by the TILA undermines her contention that any non-disclosure was intentionally designed to mislead her.

68. At best, the failure to provide disclosures required by the TILA could be evidence in support of Mrs. Gianninoto's fraudulent omission claim. But since there is no evidence that violations of the TILA, if any, were deliberate or designed to defraud Mrs. Gianninoto, they do not provide a basis to declare the mortgage unenforceable.

**G.    Case Law Does Not Support Mrs. Gianninoto's Fraudulent Inducement Claim**

69. Essentially, Mrs. Gianninoto seeks complete forgiveness of the $890,000 mortgage against the Property based on WaMu's alleged fraud. This is an extraordinary remedy and the Court has looked for situations where such relief has been granted.

70. Mrs. Gianninoto primarily relies on *Lesser v. Strubbe*, 67 N.J. Super. 537 (App. Div. 1961), *aff'd,* 39 N.J. 90, 187 A.2d 705 (1963), for her position that a mortgage induced by fraud is void under New Jersey Law. There, the plaintiff brought an action to foreclose two mortgages granted by Mr. and Mrs. Strubbe, one of which encumbered a property in Elizabeth, New Jersey owned solely by Mrs. Strubbe. *Id.* at 541. The trial court found that Mr. Strubbe deceived Mrs. Strubbe into believing that the mortgages she signed applied only to properties that the couple owned jointly. Because Mrs. Strubbe was misled as to the nature of the transaction, received no consideration for the mortgage, and the plaintiff mortgagee was deemed to have constructive notice of the fraud, the trial court declared the mortgage against Mrs. Strubbe's property void and unenforceable. *Id.* at 544. The trial court's decision was extraordinary because it attributed the fraud of Mr.

Strubbe to the plaintiff mortgagee. On appeal, however, the appellate division reversed and held that the evidence did not show that the plaintiff mortgagee knew or should have known that a fraud was committed on Mrs. Strubbe by her husband. *Id.* at 547.

71. Another case discussing the defense of fraudulent inducement is *In re Settlers' Hous. Serv., Inc.*, 540 B.R. 624, 633 (Bankr. N.D. Ill. 2015). There, the chapter 11 debtor sought to expunge the claim of Schaumburg Bank, which purchased assets from the FDIC as receiver after the failure of The Bank of Commerce. The debtor alleged that during the closing of a transaction in which The Bank of Commerce was assisting the debtor in its acquisition of certain properties, a document granting The Bank of Commerce a mortgage on a property of the debtor that was unrelated to the transaction was surreptitiously placed in the stack of closing documents. Because the debtor alleged that it was tricked into executing a mortgage without its knowledge and consent, the court held that this defense survived FIRREA's jurisdictional bar on a motion to dismiss. *Id*. at 635.

72. Mrs. Gianninoto's testimony makes it clear that her allegations of fraudulent inducement are very different from the frauds alleged in *Strubbe* and *Settlers*. Unlike those cases, Mrs. Gianninoto was aware that she was granting a mortgage on her interest in the Property in exchange for an $890,000 loan from WaMu. The proceeds of the WaMu loan were used to refinance an existing mortgage in the amount of $767,777.71 and pay off some of her husband's credit card debts. This was intended to be a home refinancing and that is what it was.

73. Mrs. Gianninoto has not presented clear and convincing evidence that WaMu took any deliberate action to trick her or conceal the nature of the transaction from her. Thus, the mortgage should not be declared void and unenforceable.

**H.    Conclusion**

74. Judgment will be entered in favor of Chase on its cross-claim to enforce its mortgage against Mrs. Gianninoto's interest in the Property.

75. Mrs. Gianninoto's claims against Chase are dismissed.

76. An order consistent with this decision will be entered.

*John K. Sherwood*

_____
JOHN K. SHERWOOD
UNITED STATES BANKRUPTCY JUDGE

Dated:  August 15, 2016